# EXHIBIT

# G

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN:-

NORTH CHINA SHIPPING LIMITED
of the Bahamas                                    Claimants
                                                  (Owners)

- and -

GLORY WEALTH SHIPPING PTE LTD.
of Singapore                                      Respondents
                                                  (Charterers)

"NAVIOS MERCATOR"

Charterparty dated 1st August 2007

FIRST ARBITRATION AWARD

WHEREAS:

1.     By a charterparty on the New York Produce Exchange Form (1946) form dated 1st
       August 2007 the Claimants ("the Owners") chartered the motor vessel "NAVIOS
       MERCATOR" to the Respondents ("the Charterers") for a time charter period from
       the date of delivery to minimum 1st January 2009/maximum 12th February 2009 on
       terms and conditions more particularly set out in the charterparty. The vessel was
       delivered into the Charterers' service at 11.30 hours GMT on 19th January 2008.

There was a dispute as to when the charterparty terminated and the vessel redelivered to the Owners.

2.    Clauses 17 and 95 of the charterparty provided for disputes to be referred to three arbitrators in London in a manner more particularly set out therein. Clause 95 also provided that the arbitration was to be "construed" (i.e. conducted) in accordance with the London Maritime Arbitrators Association ("LMAA") Terms current at the time the arbitration proceedings were commenced.

3.    Disputes, hereinafter more particularly defined, arose between the parties for the determination of which the Owners appointed me, Patrick O'Donovan of Churcham House, 1 Bridgeman Road, Teddington, Middlesex TW11 9AJ and the Charterers appointed me, Christopher J W Moss of 4 Charlotte Place, Wilton Road, London SW1V 1DP to be the arbitrators respectively nominated by them. We are both Members of the Baltic Exchange in the City of London and Full Members of the London Maritime Arbitrators Association. We both accepted appointment on the basis of the LMAA Terms (2006).

4.    Pursuant to the provisions of the charterparty referred to in Recital 2 above and/or the provisions of paragraph 6(b) of the LMAA Terms (2006), the seat of the arbitration is in England.

5.    The dispute referred to us concerned the Owners' claim for a balance of hire in the sum of US$302,137.95, together with damages in the sum of US$1,529,868.18 (as amended during the course of the arbitration) in respect of what they said was the Charterers' repudiatory breach in redelivering the vessel early. The Charterers denied liability for the sum claimed or any sum and counterclaimed the following:-

    (i)    US$100,631.77 and US$17,820.32 in respect of time lost as a result of an alleged inherent engine defect and a main engine stoppage;

- 3 -

(ii)     US$8,675.69 and US$2,579.40 in respect of time lost and additional bunkers consumed as a result of the alleged deficiencies in the performance of the vessel;

(iii)    US$87,197.48 and US$1,874.37 in respect of time lost and bunkers consumed at Daebul, Korea as a result of what the Charterers' maintained was the wrongful exercise of a lien;

(iv)     US$792,465.62 as damages representing an alleged loss of freight under a sub-voyage charterparty.  Both parties claimed interest and their costs.

6.      Pursuant to an agreed timetable, there was an exchange of written submissions between the Owners' London solicitors and the Charterers Singapore.  Neither party requested an oral hearing.   As envisaged by paragraph 22(a) of the LMAA Terms (2006), our Reasons are attached hereto and form part of this our Award.

**NOW WE** the said arbitrators, Patrick O'Donovan and Christopher J W Moss, having accepted the burden of this reference and having carefully and conscientiously considered the documentary evidence placed before us and the written submissions addressed to us and having given due weight thereto and finding ourselves in agreement (thereby, pursuant to paragraph 8(d) of the LMAA Terms 2006 having no need to appoint a third arbitrator) **DO HEREBY MAKE, ISSUE AND PUBLISH** this our joint and agreed **FIRST ARBITRATION AWARD** as follows:

(A)     **WE FIND AND HOLD** that the Owners' claim for a balance of hire succeeds in full and that their claim for damages succeeds to the extent of US$1,589,764.70 and no more.

- 4 -

(B) <u>WE THEREFORE AWARD AND ADJUDGE</u> that the Charterers shall forthwith pay to the Owners the said sum of US\$1,891,902.60 (one million, eight hundred and ninety-one thousand, nine hundred and two United States dollars and sixty cents) <u>PLUS</u> interest thereon at the rate of 3% (three per cent) per annum or pro rata compounded at three-monthly rests from 5th January 2009 until the date of payment.

(C) <u>WE FURTHER AWARD AND ADJUDGE:</u>

(i) that the Charterers shall bear their own costs and pay the Owners' recoverable costs of the reference insofar as they relate to the matters herein determined (and the Owners' said costs may, if not agreed, be determined by us or in the High Court in London in the Owners' option on the basis set out in s.63(5) of the Arbitration Act for which purpose <u>WE HEREBY RESERVE JURISDICTION</u>.

(ii) that the Charterers shall further bear the costs of this our Second Arbitration Award in the total sum of £9,030.00 (inclusive of our fees and interlocutory charges in relation hereto) <u>PROVIDED ALWAYS</u> that if, in the first instance, the Owners shall have paid any amount in respect of the costs of this Award, they shall be entitled to immediate reimbursement by the Charterers of any sum or sums so paid; <u>AND</u>

(iii) that the Charterers shall pay any sums payable/reimbursable to the Owners under sub-paragraphs C(i) and (ii) above at the rate of 4% (four per cent) per annum or pro rata compounded at three-monthly rests from the date of this our Arbitration Award until the date of payment or reimbursement as appropriate.

D) <u>WE DECLARE</u> that this Award is <u>FINAL</u> as to the matters hereby determined.

- 5 -

**GIVEN** under our hands at the seat of the arbitration in London, England this 16th day of July 2009.


Patrick O'Donovan

Witness


Christopher J.W. Moss

Witness

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION


BETWEEN:-


**NORTH CHINA SHIPPING LIMITED**
of the Bahamas                          <u>Claimants</u>
                                        (Owners)


- and -


**GLORY WEALTH SHIPPING PTE LTD.**

of Singapore                           <u>Respondents</u>
                                        (Charterers)


<u>Charterparty dated 1ˢᵗ August 2007</u>

--------------------------------------

**FIRST ARBITRATION AWARD**

--------------------------------------

## "NAVIOS MERCATOR"

### Charterparty dated 1st August 2007

### REASONS FOR AND FORMING PART OF THE

### FIRST FINAL ARBITRATION AWARD

### The background to the arbitration

1.   The "NAVIOS MERCATOR" is a 2002 built geared, self-trimming, single deck bulk carrier of 53,533 mt summer dwt, flying the flag of Panama. Her registered owners are Mercator Shipping Corporation. By a time charter on the New York Produce exchange (1946 edition) printed form she was chartered by her registered owners to Korea Line Corporation for a period of 23-26 months. Korea Line Corporation in turn sub-chartered her on back-to-back terms (save as to rates) to the Claimant in this arbitration, North China Shipping Ltd of the Bahamas ("the Owners"). The Owners in turn sub-chartered her to the Respondent in this arbitration, Glory Wealth Shipping Pte Ltd of Singapore ("the Charterers") under a charterparty dated 1st August 2007 ("the charterparty") on back-to-back terms (also with the exception of rates) for a period from delivery to earliest 1st January 2009 and latest 12th February 2009.

2.   The twentieth instalment of hire under the charterparty in the sum of US$628,647.69 was due on 30th October 2008. However, on 29th October 2008 the Charterers had sent a redelivery notice to the Owners stating that it was their intention to redeliver the vessel on or about 20th November 2008 after she had completed discharge at Daebul, Korea. That notice was rejected on behalf of the Owners who pointed out that the earliest contractual redelivery date was 1st January 2009.

- 2 -

3.      Some significance was attached by the Owners to the fact that on 30th October 2008 the Charterers had sent out a circular to the shipping market at large referring to the fact that they were experiencing financial difficulties and that they would be approaching their business partners with *"proposals of restructuring"*.

4.      On 3rd November the Charterers paid the sum of US$511,465.29 in respect of the twentieth instalment of hire, making deductions for off-hire as a result of a main engine stoppage of some ten hours duration and off-hire/damages for under-performance on the previous voyage from San Lorenzo to Dammam. This deduction was supported by a report from the weather monitoring service, AWT. The Owners accepted that there had been a main engine stoppage although they disputed the sum deducted. They took issue with the performance claim.  According to their calculations the Charterers had underpaid hire to the extent of US$99,359.97.

5.      Prior to loading at San Lorenzo the vessel had waited for a period of 34 days at Praia Mole, Brazil and the Owners' case was that *if* there had been any falling-off of performance on the subsequent voyage from San Lorenzo to Dammam (which they denied) then it was to be attributed to bottom fouling as a result of the stay at Praia Mole. The Owners also emphasised when the performance claim was first presented that the vessel's particulars as stated in the charterparty were qualified by the phrase "without guarantee".  They maintained that any performance claim was therefore misconceived in principle.

6.      The Charterers' circular (referred to at paragraph 3 above) had (as they freely admitted) put the Owners on notice that there was at least a strong possibility that the Charterers would default in their obligations under the charterparty. On 3rd November 2008 the Owners therefore decided to cancel the authorisation which they had previously given to the Charterers' agents to sign bills of lading for and on behalf of the Master in respect of the bauxite cargo to be loaded at Weipa, Western Australia, for carriage to Daebul.

- 3 -

7.      The vessel completed loading and left for Daebul on 6th November 2008.

8.      Discussions between the parties led to an agreement on 10th November that the Charterers would put the hire deducted of US$99,359.97 into an escrow account. The Owners then agreed to instruct the Master to re-issue a letter of authorisation to the Charterers' agent to issue bills of lading on behalf of the vessel.

9.      However, the registered owners of the vessel then intervened stating that they could not follow the Owners' instructions because they could not know whether any bills of lading had in fact been issued by the Owners' agents under the letter of authorisation. They suggested that the Charterers might appoint the Owners' agents as their own agents or, alternatively, that the Charterers' agents might appoint the Owners' agents as sub-agent. This solution commended itself to the Owners but the Charterers rejected it, insisting that the Master issue the required letter of authorisation directly to their own agents.

10.     On 12th November the Owners authorised the Charterers' agents directly to sign and issue the bills of lading to the shipper. However, the Owners' agents had received the letter of authorisation from the Master and on 13th November the Owners instructed their own agents to authorise the Charterers' agents to sign and release the bills of lading.   At this stage events took an unexpected turn in that the Charterers' agents responded to the Owners by stating that they had been instructed not to sign bills of lading until they received authorisation from the Master.   On 14th November confirmation was received from the Charterers that it was they who had instructed their agents at the loadport not to issue the bills of lading until they received a letter of authorisation from the Master. The Charterers made it clear that they would hold the Owners responsible for any losses resulting from the unfortunate sequence of events concerning the issuing of bills of lading. Not surprisingly, the Owners maintained that

they had done everything in their power to assist the Charterers and that it was the Charterers' own decision which had delayed the issuing of the bills of lading.

11.    The twenty-first payment of hire under the charterparty became due on 14th November but no payment was made.

12.    Foreseeing a possible delay in discharge, the Owners instructed their agents on 17th November 2008 to issue and release the bills of lading to the shipper, taking the view that since these were signed for and on behalf of the Master no prejudice could result to anyone either under the charterparty or under a sub-charterparty between the Charterers and K C Corporation.

13.    When they learnt – on 17th November – that bills of lading had been issued by the Owners' agents to the shipper, the Charterers immediately sent the Owners a letter of indemnity indemnifying the Owners against the consequences of delivering the cargo to K C Corporation at Daebul without production of the original bills of lading.

14.    First on 6th November - and subsequently on 10th, 14th and 17th November - the Charterers sent redelivery notices to the Owners through the broking channel stating that they intended to redeliver the vessel on/about 20th/21st November on dropping the pilot outbound from Mokpo port, South Korea. Each of these notices was rejected by the Owners.

15.    In the light of the Charterers' failure to remit the sum of US$99,359.97 deducted from twentieth payment of hire to the escrow account as agreed and their failure to pay any part of the twenty-first payment of hire, the Owners decided to exercise a lien over the cargo and sub-freights by instructing the Master not to berth the vessel at Daebul.

- 5 -

16.     Agreement was reached between the parties on 25th November 2008 for the sub-freight to be paid into an escrow account. The Owners then instructed the vessel to berth and discharge. In fact the payment into the escrow account was never made and pursuant to an order of a Korean Court, another party – KLC – attached the sub-freight on 1st December. The vessel completed discharge on 1st December and sailed from Daebul the same day.

The claims and counterclaims

17.     The Owners claimed hire up to 18.41 hours on 20th November in the total sum of US$14,142,304.43. Giving credit for hire payments made of US$13,840,166.48, they claimed a balance of hire in the sum of US$302,137.95.

18.     In addition to their claim for a balance on final time charter accounts, the Owners claimed damages on various alternative bases, amounting to US$1,605,488.39, US$1,529,868.18 or US$1,453,974.19 respectively, resulting from the early redelivery of the vessel. It was common ground that the remaining charter period (up to the earliest redelivery date of 1st January 2009) was 41.554861 days.

19.     The basis of the Owners' claim was the opinion of their expert, Mr Bruce McDonald, that a fair market rate for the vessel for the period in question was between US$5,200.00 and US$5,300.00 per day. Taking the figure of US$5,250.00 per day as a mean figure from the range provided, the Owners calculated their loss as a result of the early redelivery as follows:-

41.554861 days × [US$43,500.00 minus US$5,250.00 = US$1,589,616.80 less brokerage commissions (3.75%)] = US$1,529,868.18

- 6 -

20.     In the alternative, the Owners put forward a calculation based on what had actually happened to the vessel following the early redelivery. They maintained that for the first 11.853472 days of the unexpired charter period of 41.554861 days the vessel was unable to earn anything in the market so that they were entitled to claim the full charter rate less commission as damages from the Charterers. For the remaining 29.701388 days they took the difference between the charter rate and the market rate for this period. Relying on the evidence of Mr McDonald that the vessel would have been able to perform a thirty day voyage and that the applicable rate would have been between US$4,6000.00 and US$4,800.00 per day they calculated their damages on this alternative basis as follows:-

(i)     US$496,290.06 [US$43,500.00 x 11.853472 days less 3.75% brokerage commission]; plus

(ii)    US$1,109,198.33  [US$43,500.00  minus  US$4,700.00  x  29.701388  days,  less brokerage commission of 3.75%]

        = US$1,605,488.39

21.     In answer to expert evidence put forward by the Charterers that the vessel was worth "at least US$10,000.00 per day", the Owners put forward a yet further alternative calculation of their damages.  Their expert, Mr McDonald, took the view that this calculation was, however, based on a false premise, in that the rate of US$10,000.00 per day was the sort of rate which might have been obtained for a longer period time charter – but which was not relevant to the present calculation. Since he understood that the Owners only had the use of the vessel up to 12th February 2009 at the latest, any calculation based on the possibility of a longer term time charter was unsupportable in principle.

22.   However, if the Charterers were correct in using a market value of US$10,000.00 per day for the balance of the charter period, the Owners calculated their losses as follows:-

(i)   US$496,290.06 [US$43,500.00 x 11.853472 days less brokerage commission 3.75%]; plus

(ii)   US$957,684.13 [US$43,500.00 minus US$10,000.00 x 29.701388 days less brokerage commission 3.75%]

= US$1,453,974.19

23.   We turn then to the Charterers' response to the balance of hire claim and the claim for damages.

24.   They maintained that the hire claimed as the twentieth instalment (US$510,195.60) was overstated because it did not give credit for time lost and bunkers consumed as a result of the main engine stoppage on 1st October 2008 during the San Lorenzo/Dammam voyage. They claimed credits in the total sum of UUS$17,820.32 in respect of this stoppage.

25.   They also maintained that they were entitled to set off against the twentieth payment of hire the sum of US$100,631.77 in respect of time lost and extra bunkers consumed resulting from "the defect and/or inefficiency in the engine that lead to the breakdown and continued after the breakdown". This claim was supported by an analysis of the San Lorenzo/Dammam voyage prepared by the voyage routing consultants, AWT. They relied in this context on that part of Clause 15 of the charterparty which reads:-

> "... *and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra*

- 8 -

*fuel consumed in consequence thereof, and all extra expenses shall be deducted from hire."*

26.  The background to this claim was the fact that whilst the vessel had been able to perform at or about 14 knots when requested do to so in the period immediately following delivery on 19th January 2008, the Charterers maintained that her performance had fallen off from the start of the San Lorenzo/Dammam voyage, leading to the stoppage of the main engine.   They refuted the suggestion that any fouling of the hull had occurred as a result of the wait at Praia Mole, pointing to the fact that on departure from the subsequent ports of San Lorenzo and Santos she was able to achieve good speeds.   The effect of that continuing performance deficiency continued (so they maintained) throughout the voyage from Weipa to Daebul and the Charterers' counterclaim for US$8,675.69 and US$2,579.40 in respect of an alleged reduction in speed and over-consumption of bunkers was based on the analysis of the results of this voyage.

27.  So far as their counterclaim for a loss of freight under the sub-voyage charterparty was concerned, the Charterers maintained that they had prepared a freight account for their sub-charterers on 11th November showing a balance due to them of US$792,465.62 but that they were unable to obtain settlement of that invoice in the absence of a signed bill of lading. They submitted that the Owners' decision to revoke the authority previously given to the Charterers and their agents to sign the bills of lading was a breach of Clauses 8 and 60 of the charterparty. Indeed, it was, so they submitted, a breach of such a fundamental nature (since it prevented them from obtaining freights from their sub-charterers) as to be repudiatory. They were therefore entitled to accept this breach as bringing the charterparty to an end once the outcome of the Owners' decision to revoke their right to issue bills of lading was known. They maintained that they had accepted this breach as bringing the charter to an end on 20th November.

28.     Although the Owners appeared to reverse their decision to revoke the authority to issue bills of lading on 10th November, the Charterers maintained that they had in fact maintained their original stance by refusing to allow their agents as sub-agents to Charterers' agents for signing purposes and continuing to control the right to collect freight from the sub-charterers.

29.     Not only did these breaches entitle them to terminate the charterparty but they also entitled them to claim damages, including, so the Charterers argued, the lost sub-charterparty freight. But for the Owners' breaches, they maintained this sub-freight would have been paid to them by 13th November and would immediately have been used to pay hire due on 14th November. Since this claim for damages impeached the Owners' right to hire, the Charterers maintained they were entitled (on the well-established principles of equitable set-off against hire) to set this off against any and all hire due on 14th November. The result was, so they argued, that there was a balance of damages due to them at that point amounting to US$163,817.93.

30.     The Charterers' case was that when the vessel arrived at the discharge port on 17th November there was no balance of hire due to the Owners and that their exercise of the lien was therefore wrongful. They referred to the fact that they had requested the pilot to board and berth the vessel at 16.00 hours on 18th November but that this request was refused. Faced with what they maintained was a continuing refusal by the Owners to follow the terms of the charterparty, they maintained that they were entitled to and had accepted repeated breaches of charter as repudiatory and finally gave notice on 20th November that they were accepting these breaches as terminating the charterparty.

31.     The Charterers claimed off-hire or damages equivalent to hire for the time lost at the discharge port from 16.00 hours on 18th November when they requested the vessel to berth until 17.59 hours on 20th November when the charterparty was terminated. In monetary terms this was calculated as follows:-

2.082633 days x US$43,500.00 per day less 3.75% commission = US$87,197.48 + US$1,874.37 IFO bunkers (2.0826388 days x 2.5 mt IFO per day idle consumption x US$360.00 per mt) = US$89,071.85

<u>Our conclusions in relation to the balance of account claim and the Charterers' counterclaims</u>

32.     As we have already noted, when the Charterers first put forward their claim in relation to the performance of the vessel the Owners pointed out that the speed and consumption particulars of the vessel contained in Clause 29 of the charterparty were qualified by the presence of the phrase *"without guarantee"*. On the basis of the decision in *The "Lipa"*, the Charterers were not therefore entitled to review the vessel's performance and put forward any claim for breach of warranty. Their only entitlement to damages in relation to reduction in the speed of the vessel was therefore by reference to the off-hire clause, Clause 15, and involved them having to establish a *"defect in or breakdown of"* the vessel.

33.     The Owners submitted (and we accept) that there was no evidence of any inherent defect in the condition of the vessel (and, in particular, of her main engine) throughout the material period. The Charterers were – we assumed – receiving daily reports from the vessel and there was no evidence that they had made any complaint about her performance at the time. Nor was any under-performance apparent from the report prepared by AWT. As the Owners pointed out, it seemed to be clear from the AWT report that there were days during which the vessel experienced good weather and on which she performed at or about the speed of 14 knots stipulated in Clause 29.

34.     The Charterers' case that the vessel was suffering from some sort of defect which entitled them to invoke the off-hire clause therefore rested on the fact that it had been

- 11 -

necessary to stop the main engine for a period of approximately ten hours during the course of the San Lorenzo/Dammam voyage. In his contemporaneous report the Master had explained that the main engine was stopped due to *"main engine lub oil and fresh water temperature increased to high side"*. The crew then carried out cleaning of the sea water filters and cleaning of the cooler which is responsible for cooling the fresh water in the lube oil jacket on the sea side of the main engine. The Owners described this work as "routine maintenance" and we had no reason to doubt that this was so. Once the sea water filters (which could have been clogged as a result of bottom fouling) and the fresh water cooler were cleaned there seemed to us to be no continuing problem with the vessel. The Charterers attempt to suggest otherwise was completely unconvincing.

35.   We were satisfied therefore that the Charterers had failed to establish any entitlement to place the vessel off-hire under Clause 15 or to claim damages equivalent to hire and bunkers as a result of any defect in the vessel's machinery. Their only entitlement to deduct from hire was in respect of the period of 10 hours during which the main engine was stopped. That was conceded by the Owners. It seemed to us that the Owners were correct therefore in contending that as at 30th October 2008 there was a balance of hire due in the sum of US$610,825.25. Since the Charterers had paid only US$511,465.29 (on 3rd November) there was a balance due in respect of the twentieth instalment of hire of USUS$99,359.97.

36.   The Charterers' breach in failing to pay hire due in full as at 30th October was compounded by the fact that they subsequently reneged on their agreement to pay the balance of US$99,359.97 into an escrow account.

37.   In view of our conclusion that the Charterers had failed to establish a defect in the vessel's machinery entitling them to put the vessel off-hire under Clause 15, we did not need to consider the evidence as to whether any falling off in performance could be attributed to the delay at Praia Mole for 34 days. Suffice it to say that we were not

- 12 -

impressed by the Charterers' argument that because this period occurred during the winter in the southern hemisphere, it was unlikely that there would have been any significant fouling. In our view it was very likely that significant fouling would have occurred at this geographical location during a period of 34 days. That may well have been responsible – in whole or in part – for the stoppage on the subsequent voyage to clean the sea water filters.

38. Turning then to the Charterers' counterclaim in respect of the delay at the discharge port, we note first of all that it seemed to us to be clear that by the time the vessel arrived at the discharge port there was a significant balance of hire outstanding to the Owners. We therefore reject the Charterers' argument that the exercise of the lien was wrongful.

39. Similarly, on the evidence before us it seemed to be clear that the Owners were correct in arguing that not only did the events relating to the issuing of the bills of lading referred to above not constitute a repudiatory breach of charter on their part, but that they were irrelevant to the issues in this arbitration.

40. As the Owners emphasised, as early as 29th October the Charterers had made it clear that they intended to terminate the charterparty by redelivering the vessel on or around 20th November – and that they had persisted in this intention. The Owners' suspicion that the Charterers were attempting to delay payment of hire under the charterparty whilst at the same time seeking to collect freight under the sub-voyage charter with K C Corporation seemed to us to be far from groundless. The Owners argued that in the light of the Charterers' conduct and their own concerns they were entitled to cancel the authorisation given to the Charterers and their agents to issue bills of lading. We agree. Revoking this authority did not therefore amount to a breach of charter but, even if it did, we also agreed with the Owners that it could not be regarded as a repudiatory breach since the Charterers were not deprived of the benefit of the charterparty or prevented from performing the sub-charter with K C Corporation.

41. A further difficulty facing the Charterers in their argument that they had accepted the Owners' conduct as a repudiatory breach bringing the charter to an end on 20th November was, as the Owners pointed out, that their behaviour was inconsistent with this position. They had continued to perform the charterparty relying on the bill of lading actually issued and had requested the Owners to deliver the cargo at Daebul without production of the original bills of lading. If there had been any repudiatory breach, the Charterers had therefore waived their right to rely on it as bringing the charter to an end.

42. So far as the Charterers' counterclaim for damages representing the loss of the freight under the voyage charterparty to K C Corporation was concerned, in the light of our conclusion that the Owners were not in breach by exercising their right to lien at the discharge port, that was bound to fail. However, the Owners also pointed out that there was no evidence on the basis of which we could conclude that payment of freight to the Charterers under the voyage charter was prevented as a result of any breach that there might have been by the Owners, whether in respect of the bills of lading or otherwise. As the Owners emphasised, at no point had they refused to issue bills of lading. It may have been the case in practice that the only way in which the Charterers would have been able to pay any further hire due under the charterparty was by using the voyage charterparty freight. However, non-payment of the voyage charter freight could not, as a matter of law, provide an excuse to the Charterers for a failure to pay hire under the charterparty.

43. Furthermore, since the vessel was performing in the Charterers' service on the Weipa/Daebul voyage, it could not be said that the Owners' entitlement to hire was impeached by any of the Charterers' counterclaims. They were not therefore entitled to set off the sums counterclaimed against hire on the basis of a right of equitable set-off.

- 14 -

44.    We concluded therefore that from as early as 28th October the Charterers had made clear
       their intention to repudiate the charterparty by redelivering at the end of the
       Weipa/Daebul voyage. Their conduct thereafter in failing to pay hire due constituted
       further evidence of an intention no longer to be bound by the terms of the charterparty.
       Their allegations that the Owners were themselves in repudiatory breach were therefore
       completely unfounded and the Owners were entitled to accept the Charterers'
       repudiatory conduct as bringing the charterparty to an end – as they did - on completion
       of the Weipa/Daebul voyage.   The Charterers' counterclaims therefore failed entirely
       and the Owners were entitled to damages representing their losses during the balance of
       the charter period.

       Our conclusions in relation to the Owners' claim for damages

45.    The underlying objective of any award of damages is to place the innocent victim of the
       breach of contract in the same position as it would have been in had the charterparty
       been performed. It seemed to us that our task was therefore to establish what the vessel
       had earned (or could have earned) during the balance of the charter period and then to
       compare that with the net hire which the Owners would have received had the charter
       continued for its full term. The difference between the two would be the measure of the
       Owners' damages arising from the early redelivery.

46.    Two issues of principle were raised by the Charterers in their submissions in relation to
       the claim for damages. The first was that the Owners were obliged to give credit for the
       fact that they had redelivered the vessel to their head owners on 2nd December 2008. The
       second was that the magnitude of the loss claimed by the Owners was too remote to be
       foreseeable.

47.    Contrary to the suggestion made on behalf of the Charterers, the Owners explained that
       in redelivering the vessel on 2nd December they had redelivered at the end of the

- 15 -

contractual term under their time charter with their head owners and had not redelivered early. However, we had to assume that they would have been in a position to continue the performance of the subject charterparty, regardless of the contractual arrangements which they had with their head owners (whether by obtaining an extension of that charterparty or some other means). The position under the charter between the Owners and their head owners was therefore irrelevant in our view to the calculation of damages under the subject charterparty.

48.     For the first 11.853472 days of the unexpired charter period of 41.554861 we agreed with the Owners that the measure of their damages was the net hire which they should have received, since the vessel was not free of cargo and in a position to be re-fixed until the end of this period (17.55 hours GMT on 1st December). The Owners were therefore entitled to damages in the sum of US$496,290.06 for this part of the unexpired period.

49.     The crucial issue so far as damages was concerned was therefore what the vessel could have earned during the remaining 29.701388 days of the unexpired charter period. As we have noted, the Owners' expert, Mr McDonald, took the view that a time charter equivalent of US$4,700.00 per day was realistic.

50.     The Charterers' expert, Mr Christopher Lewis, referred to the fact that on 13th November 2008 the vessel had been reported fixed for a time charter trip "*via PG rdel PMO*" at a rate of US$7,000.00 per day. Then, on 14th January 2009, she had been reported fixed for a time charter trip with delivery PMO "*via west coast India redl China*" at a rate of US$5,000.00 per day.

51.     Mr McDonald had looked at the market over the period from 20th November to 1st January 2009 and had calculated that a fair market rate for the vessel over the whole of this period was between US$5,200.00 and US$5,300.00. Although he had taken the lower rate of US$4,700.00 for the period of 29.701388 days, on the evidence before us we were

- 16 -

satisfied that the daily rate of US$5,250.00 represented the best evidence of what the market rate for the vessel was during the balance of the period from 2nd December 2008. Of the various alternative calculations put forward by the Owners we concluded that that which showed that they had suffered a loss of US$1,529,868.18 was the most reliable. The Owners were therefore entitled in principle to that sum.

52. We then had to consider the Charterers' argument that a loss of this magnitude was too remote to be taken to have been in the reasonable contemplation of the parties at the time that the contract was made and that it was therefore irrecoverable. This argument was advanced primarily by reference to the decision of the House of Lords in *The "Achilleas"* [2008] 2 Lloyds Rep 275.

53. In addition to the loss having to be within the reasonable contemplation of the parties at the time the contract was made, the Charterers submitted on the basis of this authority that it also had to be reasonable in the actual commercial context, ie. in the particular situation in question, would a party have assumed the risk of potential liability to the magnitude claimed?

54. The Charterers noted that in the situation considered in *The "Achilleas"* the market had doubled between September 2003 and April 2004 and that in relation to such market volatility, Lord Rodger had noted (at page 2085) that:-

> "... the extent of the relevant rise and fall in the market within a short time was actually unusual. The Owners' loss stemmed from the unusual occurrence. "

55. They also referred to the following passage in the speech of Baroness Hale:-

> *"The contract breaker is not inevitably liable for all the loss which the breach has caused.  Loss of the type in question has to be "within the contemplation" of the parties at the time the contract was made ...*
>
> *It was only because of the unusual volatility of the market at that particular time that this particular loss was suffered."*

56.   In the present case on the basis of the Owners' evidence the Charterers argued that there had been a fall in the market rate for vessels of this type from US$43,500.00 down to US$3,000.00 per day over the relevant period, a drop of more than 93%.  It would not, the Charterers submitted, have been within the contemplation of the parties at the time of entering into the charterparty that a breach would have exposed the Charterers to a loss in terms of damages of this magnitude.  By reference to historical rates, they submitted that what was foreseeable was a loss of no more than 50% on a year on year basis.  Any loss in excess of this was not foreseeable and was not therefore recoverable.

57.   The extent to which the decision of the House of Lords in *The "Achilleas"* has introduced some new or additional test in relation to the recoverability of damages is a matter of continuing academic debate.  However, in the reported cases since that decision of the House of Lords the Courts appear to have been unanimous in their view that the decision in *The "Achilleas"* turned on its own facts to a considerable extent.  As Cooke J put it in *Classic Maritime Inc –v- Lion Diversified Holdings & Limbungan Makmur SDN BHC* [2009] EWHC 1142 at paragraph 75 when commenting on the speech of Lord Rodger:-

> *"Although he placed emphasis upon the extreme volatility of the market in that case, at paragraph 60 he drew attention to "the kind of loss" for which the owners were claiming damages which occurred because of a combination of the extremely volatile market and the particular arrangements made by the owners for the follow-on fixture.*

- 18 -

He continued at paragraph 73:-

> "At para 21 he [Lord Hoffman] *again stressed the general acceptance that a contracting party will be liable for damages for losses which are unforeseeably large if loss of that type or kind falls within one or other of the rules in Hadley –v– Baxendale and stated that there was an inclusive principle: "If losses of that type are foreseeable, damages will include compensation for those losses, however, large."*

Then at paragraph 77 he stated:-

> "In my judgment, notwithstanding references to the unforeseen degree of fluctuation in the market, not one of their Lordships was saying that, if the type of loss was within the contemplation of the parties or that for which the party in breach must be assumed to have accepted responsibility, some of it might be irrecoverable because the extent of it was unexpected."

58.   In our view, if the parties at the time of entering into the charterparty had been asked what measure of damages they both contemplated as likely to arise in the event of the breach with which we were concerned in this case, there could have been little doubt that they would both have answered that the measure of damages would be the difference between the charterparty rate and the market rate for the balance of the charter period.   This was not a case involving a loss of a subsequent fixture and a renegotiation of the charter rate in order to maintain the fixture - as happened in *The "Achilleas"*. This was simply a routine case where a deliberate breach in redelivering a vessel early exposed the owner – rather than the charterer - to the risk of a market which had fallen dramatically over a short period.   That risk could not in our view be said to have been unforeseeable.

59.   It followed that the Charterers were not entitled to rely on the accepted principles of remoteness or foreseeability to limit the extent of the loss which we have found flowed from their breach.  We calculate the Owners' entitlement to damages as follows:-

   (i)   For the period 20th November to 1st December (11.53472 days): US$496,290.06;

   (ii)   For period 1st December 2008 to 1st January 2009 (29.70138 days): US$1,093,474.70 (net of 3.75% brokerage commissions).

   The total damages due to the Owners in respect of the early redelivery therefore amount to US$1,589,764.70.

60.   In accordance with the principles applying in English Court and arbitration proceedings the Owners are entitled to their costs of the arbitration, including the costs of our Award.

# EXHIBIT

# H

Case No: 2009 Folio 1066

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
IN AND ARBITRATION APPLICATION
AND IN THE MATTER OF AN ARBITRATION

THE HONOURABLE MR JUSTICE TOMLINSON:



BETWEEN:

### GLORY WEALTH SHIPPING PTY LTD

Claimant
(Respondent in the Arbitration)

-and-

### NORTH CHINA SHIPPING LIMITED

Defendant
(Claimant in the Arbitration)

### M/V NAVIOS MERCATOR

---

### ORDER

---

**BY CONSENT**

**IT IS ORDERED that:**

1. The arbitration award dated 16 July 2009 be varied at paragraphs (A) and (B) as follows:

"(A) WE FIND AND HOLD that the Owner's claim for a balance of hire succeeds in full and that their claim for damages succeeds to the extent of US$953,690.91 and no more."

"(B) WE THEREFORE AWARD AND ADJUDGE that the Charterers shall forthwith pay to the Owners the said sum of US$1,255,828.81 (one million, two hundred and fifty-five thousand, eight hundred and twenty-eight United Stated dollars and eighty-one cents) PLUS interest thereon at the rate of 3% (three per cent) per annum or pro rata compounded at three-monthly rests from 5th January 2009 until the date of payment."

2. No order as to costs.

DATED:   20th day of April 2010

Claim No: 2009 Folio 1066

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

BETWEEN

**GLORY WEALTH SHIPPING PTY LTD**
**Claimant**
**(Respondent in the Arbitration)**

-and-

**NORTH CHINA SHIPPING LIMITED**
**Defendant**
**(Claimant in the Arbitration)**

**M/V NAVIOS MERCATOR**

---

**ORDER**

---

Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS

Tel: 020 3116 3000
Fax: 020 3116 3999

**Solicitor for the Defendants**

Solicitor's Reference: SAK\765501.00007

3